Filed 5/7/15  P. v. Asturias CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>RICARDO A. ASTURIAS,<br><br>　　　Defendant and Appellant. | A137391<br><br>(San Francisco City and County<br>Super. Ct. No. 215883) |

　　　Appellant Ricardo A. Asturias was convicted, following a jury trial, of continuous sexual abuse of a child and possession of child pornography.  On appeal, he contends (1) the trial court erred and violated his constitutional right to a public trial when it closed the courtroom during the testimony of the minor victim's parents; (2) the trial court abused its discretion and violated appellant's due process rights when it admitted evidence of prior uncharged sexual offenses; and (3) the award of $625,000 in noneconomic restitution was not authorized by law, violated his due process rights, and constituted an abuse of discretion; he further claims that the restitution awards for both economic and noneconomic damages violated his right to a jury trial.  We shall affirm the judgment.

**PROCEDURAL BACKGROUND**

　　　Appellant was charged by amended information with one count of continuous sexual abuse of a child under the age of 14 (Pen. Code, § 288.5, subd. (a)—count 1);[1] two counts of lewd acts on a child under the age of 14 (§ 288, subd. (a)—counts 2 & 3); and one count of possession of child pornography (§ 311.11, subd. (a)—count 4).

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Following a jury trial, appellant was convicted of continuous sexual abuse of a child under the age of 14 and possession of child pornography.

On December 14, 2012, the trial court sentenced appellant to a total term of 16 years, eight months in prison. The court also awarded the victim $5,875 in economic restitution and $625,000 in noneconomic restitution.

Also on December 14, 2012, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

### Prosecution Case

At the time of trial, "Jane Doe," who was born in 2004, was eight years old and in the third grade. She lived with her parents and her 13-year-old brother Her mother, "Mrs. Doe," testified that appellant is the first cousin of Jane's father, and the children called him Uncle Al. Appellant was a constant presence in the lives of the Doe children; they often saw him on a weekly basis for weekend dinners at the Doe house, at family events, and on vacations. In addition to other vacation trips, appellant frequently traveled with the Doe family to Jane's uncle's vacation home in Sonoma County, which the family called "the ranch." When he visited the Doe home, appellant sometimes went upstairs with Jane to her room, to see her artwork or play a game. They would be there alone for five to twenty minutes. Jane's parents trusted appellant "completely." Jane felt like appellant was her uncle and she loved him very much. Appellant lived in an apartment about five blocks from the Doe home.

On October 1, 2010, after appellant had volunteered to babysit for Jane and her brother while their parents went out to dinner to celebrate their birthdays, Mrs. Doe mentioned his offer to her husband in front of Jane, who was sitting nearby. The next night, October 2, Jane, who was then six years old and in first grade, told her mother, "I want Uncle Al to visit, but I don't want him to babysit." When Mrs. Doe asked her why not, Jane asked, "Can I tell you a secret?" She then told Mrs. Doe that appellant "tickles my privates and I don't like it." Mrs. Doe was "completely stunned." She asked follow-up questions, and Jane told her it happened "[e]very time he goes to my room." Jane seemed hesitant and uncomfortable about "telling on" appellant. She also seemed shy

2

and embarrassed. Mrs. Doe assured her that appellant would not be babysitting, and then dropped the subject until she had a chance to talk to her husband, who was working a 24-hour shift as a firefighter.

On October 4, 2010, Mrs. and Mr. Doe, who were still "in disbelief," asked Jane some questions about what appellant had done. Jane told them that appellant had touched her privates under her underwear and had put his finger inside her. She said the touching had happened in her room and also at the ranch, the vacation home in Sonoma. Mr. and Mrs. Doe waited a couple of days to report what Jane had told them because Mr. Doe was initially extremely upset and in a state of disbelief. They spoke first with an attorney friend, who explained that, if they reported the molestation, it did not mean Jane would be taken away from them. Mr. and Mrs. Doe then met with a social worker who helped them to make a report to Child Protective Services. In mid-October, Jane was interviewed at CASARC (Child and Adolescent Support Advocacy and Resource Center) at San Francisco General Hospital. Jane also had a medical examination.

Mrs. Doe recalled that, on one occasion a short time before the disclosure, Jane did not want to hug appellant goodbye, which was unusual for her. Since the disclosure, they had talked about appellant on occasion. Jane had "wanted to make sure that [appellant] wouldn't be coming to the house, that she wouldn't see him." Mrs. Doe and Jane's therapist had also talked to Jane about the fact that she would need to testify in this case. Jane was nervous about this; she did not want to testify.

Jane Doe's father, "Mr. Doe," testified that appellant was like a brother to him. The Does and their extended family included appellant in all family gatherings and vacations, including visits to the ranch in Sonoma. Appellant also came to dinner at the Doe home almost weekly for many years. When he was at their house, appellant would often go upstairs with Jane to read a book or look at her artwork. When they were at the ranch, appellant and Jane also spent time alone together in the living room, watching movies on a laptop. Even when there were numerous children at the ranch, appellant paid particular attention to Jane.

3

On October 2, 2010, after his wife called him at work to let him know that Jane had told her about the molestation, Mr. Doe was "in a complete state of shock." The next afternoon, Jane told Mr. Doe that appellant was touching her in her private parts, under her clothes. She said it always happened when they were alone, either upstairs in the bedroom or at the ranch. Jane, who was six and in first grade at the time, said it had started when she was in pre-kindergarten. The following day, Mr. and Mrs. Doe spoke again with Jane, using a doll for Jane to show them where appellant had touched her. She pointed to the doll's vagina area and said that appellant had used his fingers to touch her there, under her underwear, and that he touched her "inside."

The Does then took Jane to a social worker, to make sure that the reporting of the molestation "was done in the most protective, calming way so that [Jane] was taken care of." The social worker called Child Protective Services and, at some point, the Does were interviewed by police officers. After they reported the molestation, Jane would periodically get scared and ask about what was going to happen and if she would have to see appellant again.

Before Jane's disclosure, Mr. Doe never had any reason to suspect that appellant was molesting her. At some point after the disclosure, Mr. Doe's cousin Tony told him that appellant had emailed him photographs of little girls, and Tony had told him to stop. Mr. Doe also remembered that a week or two before the disclosure, appellant had been at the Doe house for dinner and had spent time upstairs with Jane. When he left, Jane refused to hug him goodbye, which she had never done before.

Eight-year-old Jane Doe testified that appellant made her both happy and sad when she was in pre-kindergarten and kindergarten, and made her feel bad when she was in first grade. They would have "tickle fights" in Jane's room, and would tickle each other. Appellant tickled her in good spots, like her stomach, armpit, and knee. But he also tickled her in bad spots, like her foot and her vagina or private parts. Appellant would be kneeling and she would be lying on the bed when he tickled her. When he tickled her private parts, he did it both over and under her clothes. When he went under her clothes, he sometimes tickled her over and sometimes under her underwear. He used

4

one finger to tickle Jane under her underwear, on the outside of her private parts. It hurt when he tickled her there.

When Jane was in pre-kindergarten, appellant touched her private parts under her underwear more than five and less than ten times, over her underwear but under her clothes more than five and less than ten times, and over her clothes more than five and less than ten times. When she was in kindergarten, it also happened more than five and less than ten times each under her underwear, over her underwear, and over her clothes. She did not remember it happening when she was in first grade. Appellant told Jane that his tickling her vagina was " 'a secret and you can't tell.' " Jane was afraid to tell him she did not like him touching her private parts.

While Jane was in pre-kindergarten, in addition to the touching in her bedroom, appellant touched her private parts over her clothes about five times while they were sitting on the couch at the ranch in Sonoma, watching a movie. This made Jane feel bad. The only other time appellant tried to touch Jane's private parts besides at her house or the ranch was one time at a Special Friends Day at her preschool. She was sitting on his lap and his hand was on her thigh, moving closer to her private parts. She tried to push his hand away because there were a lot of other people there and she did not like it when he did that.

Jane remembered telling her parents that appellant was touching her private parts. She did not want him to babysit because she was afraid he would touch her private parts. The last time he was at her house, before she told her parents, appellant had touched her private parts over her clothes.

Isabel K. is appellant's adult daughter. She grew up in El Salvador and had moved to the United States in 1992. Isabel, who was born in 1970, testified that she had not had a relationship with appellant for over 20 years. Isabel has an older sister, Victoria A., who was born in 1967, and an older brother, Diego, who was born in 1969. She also has a stepbrother, Sebastian, who was appellant's son from a subsequent marriage; he was born in 1977 or 1978. Appellant and Isabel's mother divorced when

5

Isabel was five years old, in about 1975. She and her siblings continued to visit appellant after the divorce, usually on the weekends.

Isabel learned about appellant's criminal case from Sebastian. She did not know the Doe family, but she contacted Jane Doe's father and told him she was willing to testify in the case. She then contacted the district attorney's office. She reached out to Mr. Doe and the district attorney's office because she "believed that this has gone long— too long [*sic*] and it needs to stop."

Appellant began sexually abusing Isabel after her parents' divorce, when she was between the ages of six and eight. During his Saturday visits, he would take her and her siblings to a swim club. Her first memory of the abuse was from one day when he was sitting in a chair at the club, and he grabbed her and made her sit on his lap. He held her in place and "was kind of moving me back and forth on his privates." Appellant was wearing a Speedo and Isabel was in a swimsuit. He had an erection.

Another time, Isabel was alone with appellant at a coffee farm he owned. It was very hot outside and appellant said they should swim naked in the river. In the river, he pulled her toward him and touched her vulva with his erect penis, though his penis never penetrated her vagina. While touching her, he looked at her with a "smirk," as "if it was the most natural thing in the world." After these incidents, Isabel continued to spend time with appellant because she was a little girl and, even though she did not like what he was doing, he was her father and she loved him.

On another occasion, when appellant was living at his aunt's house while she was away, he put Isabel in a walk-in closet that contained a tripod and video camera. Her brother came into the closet and said, "Huh, would you believe my dad wants me to fuck you?" They laughed and then just sat there until appellant let them out. Another day, Isabel was with appellant at his aunt's house. They were lying on his aunt's bed and appellant, who was fully dressed, was rubbing her leg. He then started to touch her vulva, on top of her underwear. She said "No" twice and pushed him away. He slapped her on the leg and said, "You're acting just like your sister Victoria." Isabel, who could hear her brothers playing in the shower in a nearby bathroom, said she wanted to go

6

shower with her brothers. Appellant made the boys get out of the shower, and he got in with Isabel. After her brothers left the bathroom, appellant soaped up his hand and started touching her vulva to the point that it hurt. He then said it was her turn to wash him, and handed her the soap. She did not recall whether she did what he asked. That night, appellant said the children had to take a pill so they would not get dengue when they visited the coffee farm the next day. They took the pills and Isabel recalled waking up in the middle of the night completely naked. She was in bed with appellant and her two brothers.

At some point, Isabel's sister Victoria asked if their father touched her in places she did not like. When Isabel said yes, Victoria took her and her brother to tell their mother what had been happening. Isabel saw appellant one more time after that, in approximately 1978, when he was about to move to the United States and he stopped by to say goodbye to Isabel and her siblings. She did not see him again after that until she came to court to testify in the present case. She was testifying "[b]ecause he needs to be stopped."

Victoria, appellant's other adult daughter, testified that she had lived all her life in El Salvador, and had not seen appellant since he left El Salvador in approximately 1980. Appellant had called her two or three times since 1980; the last time was in 2000. He also sent her an email every year on her birthday, but she never responded. Victoria, who was born in 1967, was the oldest of her siblings. She had a brother, Diego; a sister, Isabel; and a half brother, Sebastian. Victoria had learned about the criminal case against appellant from Sebastian.

Appellant began sexually abusing Victoria when she was four or five years old. The abuse stopped when she was about 12 or 13, after she told her mother about it. Before her parents divorced, in 1976 or 1977, appellant would take her into his bedroom when no one else was around, take off her clothes, and touch her vagina and masturbate her. Appellant would also be naked and would have an erection, and would fondle her with his finger and his penis. This occurred many times throughout the years. He always touched her in basically the same way, masturbating her. He also caressed her breasts.

7

After Victoria's parents divorced, when she was about nine, appellant abused her at other locations, such as at a coffee farm he owned. He would take the children there for the weekends. He would have them take off their clothes and swim in the pond. She recalled appellant fondling her vagina with his hand while sitting under a tree at the farm. After the divorce, appellant lived in a small house, where he molested Victoria many times in his bedroom. Later, appellant remarried and moved with his wife to an apartment. He continued to abuse Victoria there, fondling her vagina after getting her away from her brother and sister. Appellant also took Polaroid photographs of Victoria when she was naked. He told her to pose on the bed by lying on her belly and putting her butt up or lying on her back with her legs open. She was between eight and ten years old when he took the pictures.

The abuse never occurred around any adults or in front of Victoria's siblings. At some point, Victoria started telling appellant that she did not like what he was doing and that she wanted him to stop. In response, he told her that he loved her and the sexual acts were a way of demonstrating that love. He once showed her a book to try to prove that it was normal for an adult to demonstrate his love for a child in that way.

When Victoria was 11 or 12 years old, she asked her sister and brother whether appellant had ever touched their private parts. After they both told her he had done so, Victoria took them to her mother and told her that appellant had been molesting them and that they did not want to see him anymore. As a result, they stopped visiting appellant. Victoria did not tell her mother about the abuse sooner because she was scared. Once, when she had told appellant that she was going to tell her mother, he said that nobody would believe her, which intimidated her. Victoria was testifying because she "wanted to help to put a stop to what he has been doing all throughout his life."

Albert "Tony" B. testified that both appellant and Mr. Doe are his first cousins. He knew appellant as a child in El Salvador and they reconnected in the United States when Tony was an adult. They became close, talked on the phone regularly, emailed each other, and saw each other at family functions.

In approximately 2005, appellant occasionally sent Tony emails that had an attachment containing one or more candid photographs of a pre-pubescent girl who was naked. Appellant sent such emails five or six times, with photographs of a different girl attached to each email. Initially, Tony deleted the emails after opening them. He was concerned that the emails contained child pornography, but did not contact the authorities because he loved appellant, who was family. Tony believed appellant had a penchant for little girls. Sometime after 2001, he had talked to appellant about sexual interest in children being wrong, and appellant had responded that this country has puritanical views about children. Appellant said that in other countries it is "perfectly legal" to be with a young girl. Appellant once told Tony that he had many firewalls on his computer because he could "[g]o to jail" for the things that were on it. In 2010, Tony learned from Mr. Doe that appellant had molested Jane and spoke with a police officer who was investigating the case.

San Francisco Police Inspector Alexis Goldner testified that she had investigated this case and obtained a search warrant for appellant's home because she believed she would likely find child pornography on his computers. Goldner executed the search warrant on October 19, 2010, at appellant's residence in San Francisco. Officers seized a laptop computer, a desktop computer, two thumb drives, and a floppy disk. During a forensic examination of appellant's computers and related equipment, officers found over 900 pornographic images of young, underage girls from a site called Ukraine Angels on appellant's hardrive. The girls appeared to be under the age of 12, and were in provocative poses, with some lying down, some leaning over, and some with their buttocks in the air.[2]

Gloria Samayou, a licensed clinical social worker, testified that she worked for the San Francisco District Attorney's office, but was stationed at the Child Adolescent

---

[2] The parties stipulated that Dr. Tonya Chaffee, a board-certified pediatrician and adolescent medicine doctor who was the medical director of CASARC and a professor at the University of California, San Francisco, had examined the photographs and concluded that the girls depicted in them were between the ages of six and twelve.

Support Advocacy Resource Center (CASARC) at San Francisco General Hospital. CASARC is comprised of a forensic team that works with children who have experienced trauma. The team provides medical examinations, forensic interviews, and therapy. Samayou, who was the multidisciplinary interview coordinator at CASARC, interviewed Jane Doe on October 15, 2010. The videotaped interview was shown to the jury.

At the time of the interview, Jane was six years old and in the first grade. She said that she and her Uncle Al did "tickle fights." He sometimes tickled her in "okay" spots, but sometimes tickled her in "the not okay spots," such as the bottom of her foot, her armpit, her knees, or her stomach. Appellant and Jane also played Monopoly and read Dr. Seuss books together.

After some hesitation, Jane told Samayou that appellant sometimes tickled her in a spot she did not like. She was not sure if she should say what spot she was talking about. Jane felt "shy" about it, but agreed to write it down. Jane then said that appellant tickled her "in the private part and I don't like it there." She explained that appellant tickled her private parts, where she goes to the bathroom, with his finger. He sometimes tickled her over clothes and "the clothes wiggle because we're moving so much." Jane pointed to the vagina in a picture of a girl doll and said that was where appellant tickled her.

Appellant sometimes tickled Jane under her clothes by unsnapping her pants and putting his finger under her underwear. He would then tickle her in the middle of her vagina, "[s]ort of, just a little bit" inside. It did not feel good when he did this; it felt "weird" and hurt a little bit. This happened "[a] lot more" than once. He would tickle her vagina when they were alone in her room. He did it every time they saw each other, including the last time she saw him. She would be lying on her bed and he would be standing or kneeling when he tickled her. Appellant also touched Jane at the ranch while they were alone, watching movies on a laptop. He started touching her vagina when she was about four.

Jane never said anything to appellant when he touched her vagina because she did not want to hurt his feelings. She explained, "he's my uncle and I still like him even

10

when he does that." Jane told her parents about what he had done because she "thought maybe they would tell Uncle Al to stop."

Susan Houser, a pediatric nurse practitioner who worked at CASARC, testified about a forensic examination she performed on Jane Doe on October 20, 2010. Jane had a small notch to her hymen, which was a normal finding in both children who had been sexually abused and those who had not. Hence, it could neither confirm nor negate sexual abuse. Houser understood that the last incident of vaginal touching had occurred two weeks before the examination. Digital penetration can cause minor scratch marks and even some tearing to the hymenal tissues. The tissue, however, heals very quickly and scarring is uncommon.

Psychologist Anthony Urquiza, a professor and the director of a child abuse treatment program in the Department of Pediatrics at the University of California at Davis Medical Center, testified as an expert in child abuse accommodation syndrome. Dr. Urquiza testified that there are many misperceptions about child sexual abuse, and described child sexual abuse accommodation syndrome, which explains some of the common behaviors and experiences of children who have been sexually abused. He also explained the five components of child sexual abuse accommodation syndrome, which include secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation.

*Defense Case*

Mrs. Doe identified various photographs and described the layout of the ranch in Sonoma.

## DISCUSSION

### I. *Closure of the Courtroom During the Testimony of Jane Doe's Parents*

Appellant contends the trial court erred when it closed the courtroom during the testimony of Jane Doe's parents, violating his constitutional right to a public trial.

### A. *Trial Court Background*

Before trial, the prosecution moved to close the trial to the general public during the testimony of Jane and her parents pursuant to section 859.1, which permits closure of

11

a courtroom in certain circumstances during "the testimony of, and testimony relating to, a minor . . . in order to protect the minor's . . . reputation." (§ 859.1, subd. (a).) In the alternative, the prosecution requested that the courtroom be closed for these witnesses' testimony pursuant to factors set forth by the United States Supreme Court in *Waller v. Georgia* (1984) 467 U.S. 39, 48 (*Waller*).

During a subsequent hearing on the motion, defense counsel stated that he had no objection to the request to close the courtroom during Jane's testimony. Counsel did, however, object to closure of the courtroom during Jane's parents' testimony. Counsel argued "that the statute and the case law has not been satisfied" given that "the court needs an abundance of factors to close the courtroom. I think it's clear with Jane Doe that the privacy rights of a minor victim is absolutely overriding, but I don't think there's sufficient information to close the courtroom for adult witnesses, albeit attorneys or members of the bench or any other professionals. So I just don't think the court has a sufficient basis at this point to close the courtroom for the parents."

The prosecutor responded that the testimony of Jane's parents was clearly "going to be relating to their daughter," pursuant to section 859.1, and that there were "some unique circumstances, given the professions of the parents in this case, that they do practice [law] in San Francisco. The courthouse does contain many of their colleagues and acquaintances, some who should be excluded from the proceedings. . . . [P]art of the livelihood of them . . . depends on their reputation and that, you know, it can be tainted from this getting out into the public. So I mean, it goes towards both Jane Doe's reputation as well as her parents' reputation in this case. [¶] . . . [¶] But the main thing is to ensure and to protect the privacy of Jane Doe[,] the victim in this matter, and . . . since we know that the parents are going to be testifying in regards to acts upon her, that her privacy is most fully protected by closing the courtroom during that time." The prosecutor also stated, however, that the prosecution was open to appellant having a support person present in the courtroom during the Does' testimony.

The trial court observed that section 859.1 is applicable to, not only a minor's testimony, but also to "anybody that might be testifying about the minor, which goes to

protection of—which would relate to issues that require the protection of her, quote, reputation and confidentiality.

"And given that both of her parents practice regularly in this court, anybody coming in . . . could look in and see them and it might not mean anything. They may be here to testify for any number of reasons. But someone sitting in the courtroom is going to know very clearly that they are talking about their daughter, who's a minor, and with regard to the specific charges. And that, I think, does—in essence, that would undermine closing the courtroom for the minor's testimony because . . . they, too, are going to be testifying about the same events and, primarily, depending on how I rule on other motions, possibly what she has told them about those events. So in essence, almost the same thing as the testimony itself.

"So I do feel very strongly that certainly, these are open hearings, but I do think that with regard to Mr. and Mrs. [Doe], because their testimony does relate specifically to [Jane] and what's going on with [Jane] vis-à-vis this case, that I'm going to find that there is good cause to grant the People's motion pursuant to [section] 859.1 with regard to both [Jane's] testimony and her parents' testimony. [¶] . . . [¶]

"And I would add to that[,] knowing the culture of the Hall of Justice, any lawyer who might come in and peek in and see a defense lawyer or prosecutor sitting on the stand is going to be compelled to come in through those doors to hear what they have to say. And so while we may not intend to attract that kind of attention, it may. And before you know it, we may have quite a sizable crowd in here. And I just think that that would completely undermine any efforts we make in closing the courtroom as to [Jane] personally."

Immediately after opening statements and just before Mrs. Doe testified, the trial court stated: "I noticed that there are people out in the audience and, as a general rule, these cases are open to the public. However, for certain purposes the law does provide that I can make an exclusion order for certain people's testimony. I have made that order with regard to three of the witnesses in this case, one of whom is about to testify, so I'm going to have to ask everyone in the audience to please leave the courtroom. Thank

13

you." The following morning, just before Mr. Doe testified, the trial court said: "And as I recall, I did make a ruling that when family members were present, only court personnel, attorneys, assistants could be present in the courtroom. I know the three people in the gallery are interns for the various parties, so I'd ask that we put a sign out to make sure that we don't have anyone coming in." After Mr. Doe's testimony, the court stated : "So per the court's exclusion order, the basis for exclusion is now finished so we can take the sign off and the courtroom is reopened for the record."

## B. *Legal Analysis*

### 1. *The Public Trial Right and Exceptions to That Right*

The United States Supreme Court has upheld the right to a public trial pursuant to "two different provisions of the Bill of Rights, both applicable to the States via the Due Process Clause of the Fourteenth Amendment. The Sixth Amendment directs, in relevant part, that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . .' The Sixth Amendment right, as the quoted language makes explicit, is the right of the accused." (*Presley v. Georgia* (2010) 558 U.S. 209, 211-212 (*Presley*); accord *People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*), citing U.S. Const., amends. VI, XIV; Cal. Const., art. I, § 15; Pen. Code, § 686, subd. 1.)[3]

Although the United States Supreme Court "has further held that the public trial right extends beyond the accused and can be invoked under the First Amendment" (*Presley*, *supra*, 558 U.S. at p. 212), appellant's claim rests on his Sixth Amendment right to a public trial.

" ' " 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . .' " ' [Citations.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages

---

[3] Our Supreme Court has observed that "a defendant's state constitutional public trial right appears to be coextensive with the federal guarantee . . . ." (*Woodward*, *supra*, 4 Cal.4th at p. 381, citing *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 525-526.)

witnesses to come forward and discourages perjury. [Citations.]" (*Waller*, *supra*, 467 U.S. at p. 46, fn. omitted.)

When a defendant's public trial right is violated, the error is structural. (See *Waller*, *supra*, 467 U.S. at pp. 49-50 [agreeing with view that "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee"]; *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1424 (*Baldwin*); compare *Woodward*, *supra*, 4 Cal.4th at p. 385 [court's error, in temporarily barring new spectators from attending prosecutor's closing arguments, did not violate public trial right and, therefore, reversal was not required.)

The Supreme Court has recognized, however, that in certain situations the public trial right can give way to other important interests that would otherwise be prejudiced. "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care. . . . [¶] 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. . . .' [Citation.]" (*Waller*, *supra*, 467 U.S. at p. 45, quoting *Press-Enterprise Co. v. Superior Court of California* (1984) 464 U.S. 501, 510 (*Press-Enterprise Co.*); accord *Globe Newspaper Co. v. Superior Court for Norfolk County* (1982) 457 U.S. 596, 606-607 (*Globe Newspaper Co.*).)

In *Waller*, the court set forth the general standards for trial courts to apply before excluding the public from any stage of a criminal trial: "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to

support the closure." (*Waller*, *supra*, 467 U.S. at p. 48; accord, *Presley*, *supra*, 558 U.S. at pp. 213-214; *Woodward*, *supra*, 4 Cal.4th at p. 383.)[4]

In *Globe Newspaper Co.*, *supra*, 457 U.S. at page 607, the court addressed one overriding interest that, in certain circumstances, could overcome the presumption of openness: the well-being of a minor victim who testifies during a criminal sex-offense trial. There, the court struck down Massachusetts's mandatory rule that barred the press and public from criminal sex offense trial during the testimony of minor victims. (*Ibid.*) The court agreed with the state that its interest in "safeguarding the physical and psychological well-being of a minor is a compelling one. But as compelling as that interest is, it does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest. A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim. Among the factors to be weighed are the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives." (*Id.* at pp. 607-608, fns. omitted.)

The court further observed that, "while other States have statutory or constitutional provisions that would *allow* a trial judge to close a criminal sex-offense trial during the testimony of a minor victim, no other State has a *mandatory* provision excluding both the press and the general public during such testimony. [Citations.] Of course, we intimate no view regarding the constitutionality of these state statutes." (*Globe Newspaper Co.*, *supra*, 457 U.S. at p. 608, fn. 22.)

California is among those states that have enacted statutory provisions allowing the trial court to close a portion of a criminal sex-offense trial in certain circumstances. (See § 859.1.) Section 859.1 provides in relevant part:

"(a) In any criminal proceeding in which the defendant is charged with any offense specified in Section 868.8[5] on a minor under the age of 16 years, . . . the court

_____

[4] In *Presley*, *supra*, 558 U.S. at page 214, the Supreme Court confirmed that "trial courts are required to consider alternatives to closure even when they are not offered by the parties."

16

shall, upon motion of the prosecuting attorney, conduct a hearing to determine whether the testimony of, and testimony relating to, a minor . . . shall be closed to the public in order to protect the minor's . . . reputation.

"(b) In making this determination, the court shall consider all of the following:

"(1) The nature and seriousness of the offense.

"(2) The age of the minor . . . .

"(3) The extent to which the size of the community would preclude the anonymity of the victim.

"(4) The likelihood of public opprobrium due to the status of the victim.

"(5) Whether there is an overriding public interest in having an open hearing.

"(6) Whether the prosecution has demonstrated a substantial probability that the identity of the witness would otherwise be disclosed to the public during that proceeding, and demonstrated a substantial probability that the disclosure of his or her identity would cause serious harm to the witness.

"(7) Whether the witness has disclosed information concerning the case to the public through press conferences, public meetings, or other means.

"(8) Other factors the court may deem necessary to protect the interests of justice."[6]

## 2. *Appellant's Claim Regarding the Constitutionality of Section 859.1 was Forfeited*

Appellant first contends section 859.1 is unconstitutional on its face because it does not require the trial court to adhere to the factors described in *Waller*. According to appellant, the statute improperly "permits closure without requiring that the trial court consider reasonable alternatives to closing the courtroom, that the closure be no broader than necessary to protect an overriding interest that is likely to be prejudiced by a public

---

[5] Appellant was charged with violating two offenses specified in section 868.8: sections 288 and 288.5.

[6] Section 859.1 was amended in 2004 to protect, not only minors, but also "a dependent person with a substantial cognitive impairment." (§ 859.1 subd. (a).)

17

proceeding, and that the trial court make findings adequate to support the closure. [Citations.]" Respondent counters that appellant has forfeited the claim that section 859.1 is unconstitutional by failing to object on that ground in the trial court.

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198; accord, *People v. Romero* (2008) 44 Cal.4th 386, 411.)

Here, in light of appellant's failure to raise any facial constitutional challenge to section 859.1 in the trial court, we decline to address the issue on appeal. The failure to even hint at such an objection deprived the trial court of the opportunity to address it before making its ruling. (See, e.g., *People v. Romero*, *supra*, 44 Cal.4th at p. 411 [reason for forfeiture "rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense"].)[7]

### 3. *Application of Section 859.1 To the Present Case*

We turn now to appellant's contentions that the trial court failed to comply with the procedural requirements of section 859.1 and that its decision to close the courtroom during Mr. and Mrs. Does' testimony was substantively erroneous.

### a. *The Trial Court Complied with the Procedural Requirements of Section 859.1*

According to appellant, the trial court erred when it (1) failed to hold an evidentiary hearing and (2) made no specific findings regarding several of the factors

---

[7] At oral argument, counsel for appellant argued, in particular, that subdivision (b)(5) of section 859.1—which provides that the court must consider "[w]hether there is an overriding public interest in having an open hearing"—unconstitutionally shifts the burden to the defendant to demonstrate an overriding interest in an open courtroom, in violation of the first *Waller* factor, which requires the proponent of the closure to "advance an overriding interest that is likely to be prejudiced." (*Waller*, *supra*, 467 U.S. at p. 48.) However, in light of defense counsel's failure to object on this ground in the trial court, we will not address this or any other argument regarding the facial constitutionality of section 859.1. (See *People v. Romero*, *supra*, 44 Cal.4th at p. 411.)

18

listed in section 859.1 before granting the prosecutor's motion to close the courtroom during the testimony of Mr. and Mrs. Doe.

Appellant first argues that the court's reliance solely on the prosecutor's assertions regarding the need to protect Jane Doe's privacy, rather than conducting an evidentiary hearing, was error. Appellant cites *Baldwin*, *supra*, 142 Cal.App.4th at page 1420, in which the trial court granted the prosecutor's motion to close the courtroom during the testimony of a minor victim in a criminal sex-offense trial based only on the prosecutor's unsubstantiated statement that it would be difficult for the victim to testify in front of a large group of spectators. The appellate court found that, "[w]ithout questioning [the minor] and observing her firsthand, the trial court was in a poor position to evaluate whether [she] needed the court's protection during her testimony. [Citation.] [¶] Although there is no requirement the trial court hold an evidentiary hearing before closing proceedings, several courts have recognized this as 'the better course' [citations], and the failure to hold a hearing 'is relevant to the lawfulness of any closure' [citation]." (*Id.* at p. 1422, quoting *Guzman v. Scully* (2d Cir. 1996) 80 F.3d 772, 775-776 [without asking witness whether he felt intimidated by certain spectators, court could not ascertain whether there was an interest that was likely to be prejudiced by failing to remove those spectators from courtroom].)[8]

The present case, however, is distinguishable from *Baldwin* in several ways. First, and most significantly, defense counsel did not object to closing the courtroom for Jane's testimony and in fact acknowledged at the hearing that "it's clear with Jane Doe that the privacy rights of a minor victim is absolutely overriding."[9] Therefore, the only

---

[8] It is notable that, in *Baldwin*, the appellate court expressly found that the trial court's ruling had not been made pursuant to section 859.1, and therefore did not analyze the propriety of its ruling under that section. (See *Baldwin*, *supra*, 142 Cal.App.4th at p. 1423.)

[9] We also observe that there *was* indirect evidence in the record regarding Jane's need for protection during her testimony—and, by extension, that of her parents— regarding the sexual abuse. Before trial, the prosecution filed a motion with the trial court requesting that Jane be permitted to testify by closed circuit television due to her

19

remaining question was whether closure during the parents' testimony was necessary to protect Jane's agreed-upon privacy right.

In addition to the prosecutor's motion and argument on this point, the record contained evidence extremely relevant to the closure request. Defense counsel had previously filed a motion to disqualify the entire San Francisco County bench from presiding over the trial to avoid violating appellant's right to an impartial trial. The motion was based on the fact that Mr. and Mrs. Doe were "extremely well known members of the San Francisco criminal defense bar," who were "also well known and respected by the San Francisco County Bench." Counsel recounted in the motion that, at the preliminary hearing in this case, the presiding trial judge had stated that he had known Mr. Doe for over 25 years "in both a professional and personal level, including sporting events and social events," and that he had known Mrs. Doe "for nearly 20 years in a professional level." In a declaration attached to the motion, defense counsel further stated that Jane's father "has been a respected member of the San Francisco County Bar for over (25) years, and involved in criminal defense for as long," and that he "has professional, political, and personal relationships with most if not all of the San Francisco County Bench." He also stated that Mrs. Doe "has been a member of the San Francisco County Bar for over (15) years, and involved in criminal defense for as long." Counsel

_____

extreme discomfort about testifying in front of appellant. Declarations of Jane's mother and therapist were attached to that motion. In her declaration, Mrs. Doe, stated that Jane "feels very embarrassed and shy when asked to talk about what the defendant did." Jane had said she "could not" testify in front of appellant and "would run away" to avoid doing so. Similarly, Jane's therapist stated that, "[w]hen discussing the possibility of court testimony, [Jane] stated clearly that while she may be able to talk to someone about the incidents, she would not testify and 'run away' if she was asked to talk about the abuse incidents in front of Uncle Al." Appellant opposed the motion, based on his Sixth Amendment right to confrontation. At a hearing on the motion, the prosecutor said that "there has been some work in trying to get [Jane] comfortable enough to be able to be in the courtroom without . . . feeling that she would need to run away and be suffering from . . . so much distress that she may not be able to testify in front of the defendant in the presence of the jury." The prosecutor therefore withdrew the motion without prejudice to its renewal if necessary closer to the time of trial.

20

also noted that Mrs. Doe had been "a well respected employee" of a San Francisco governmental organization for over 15 years, and that she "has professional, political, and personal relationships with most if not all of the San Francisco County Bench." Counsel further averred that any prejudice or bias against appellant based on these "extensive relationships of the alleged victim's family" would be detrimental to the defense and would violate due process.[10]

The motion to disqualify and the accompanying declaration, both of which were contained in the case record, along with the trial court's own experience with "the culture of the Hall of Justice," were extremely relevant to the subsequent motion to close the courtroom during Mr. and Mrs. Does' testimony. They provided a basis upon which the court could consider "the extent to which the size of the community would preclude [Jane's] anonymity" (§ 859.1, subd. (b)(3)), as it determined the potential harm to Jane's reputation if the courtroom remained open during her parents' testimony. (See 859.1, subds. (a) & (b)(6).)

Appellant also argues that the court should have ascertained whether Jane's parents wished to have the courtroom closed during their testimony. He notes that, during a hearing regarding various in limine motions, Mr. Doe responded to defense counsel's request that Jane's parents be excluded from the courtroom while the court addressed certain motions. Mr. Doe, who asked to be heard on behalf of himself and his wife, stated: "So I do have an objection, as the victim's parents, to [defense counsel's] blanket assertion that there's some concern about us sitting here in terms of motions in limine. Any of the other witnesses—it's an open courtroom. It's a public forum. Any witness in this case has a right to walk into this court and listen, like any other citizen, to listen to the proceedings. . . . [¶] And so it's an effort to not let us, as parents of the victim[], sit in a public forum day-in and day-out and listen to what's going on with our

---

**[10]** The prosecutor did not oppose the motion to disqualify the San Francisco County bench, but deferred to the trial court, which ultimately denied the motion on the ground that there was no statutory authority for challenging more than "one judge one time."

21

daughter's case. . . ." According to appellant, Mr. Doe's statement about the "open courtroom" shows that he likely would have opposed the closure during his testimony. On the contrary, what Mr. Doe's statement actually reflects is (1) his belief in his and Mrs. Doe's right to be present "day-in and day-out" during in limine hearings and (2) his lack of shyness about expressing to the court his opinion on a pending in limine motion. That he apparently was present and did not say a word during the portion of the hearing addressing closure of the courtroom during his and his wife's testimony, which took place just a short time after he spoke up against their exclusion from the courtroom during any portion of the in limine hearing, provides a fairly strong inference that he did not object to such a closure.[11]

In sum, the court was able to make an informed decision based, not only on the prosecutor's motion and the hearing on that motion, but also on information already in the record that was relevant to the resolution of the issue. (Compare *Baldwin*, *supra*, 142 Cal.App.4th at p. 1420.) In the circumstances of this case, the court did not err in failing to hold a separate evidentiary hearing.

Appellant further argues, in summary fashion, that the court erroneously failed to make findings regarding many of the factors listed in section 859.1, which a trial court must consider. (See § 859.1, subd. (b) [in determining whether to close hearing to public, "the court shall consider all of the following"].) In particular, appellant argues that the court "made no finding that Jane Doe's reputation would be harmed; it conducted no analysis of the nature and seriousness of the offense; it did not assess the likelihood of public opprobrium due to the status of the victim[;] it did not assess whether there was a substantial probability that disclosure of Jane Doe's identity would cause serious harm to her[; and] [i]t did not assess how Jane Doe's age . . . factored into its decision."

---

[11] Moreover, while a parent's interests are relevant to a determination of whether the overriding interest in a minor's well-being will be prejudiced (see *Globe Newspaper Co.*, *supra*, 457 U.S. at pp. 607-608), here, where the need to protect Jane's overriding privacy interest during her testimony was already agreed to by the parties, the court's focus under section 859.1 was properly on how the parents' testimony would affect Jane's privacy rights.

Again, appellant's argument ignores a crucial fact: Defense counsel, while objecting to a closed courtroom during the parents' testimony, stated that it was "clear with Jane Doe that the privacy rights of a minor victim [are] absolutely overriding." At that point, given the parties' agreement that Jane's privacy rights warranted closure of the proceedings during her testimony, there was no reason for the court to weigh all of the factors relating to the need to protect Jane's reputation.[12] Rather, the only question before the court was whether, to fully protect Jane's privacy rights, the courtroom also had to be closed during Jane's parents' testimony. The court therefore focused on the two issues central to that determination.

The court first addressed the threshold question of whether Mr. and Mrs. Does' testimony would, like Jane's own testimony, require them to describe the sexual abuse Jane suffered. (See § 859.1, subd. (a).) As to this question, the court found that their testimony would be, "in essence, almost the same thing as [Jane's] testimony itself" and would therefore "relate specifically to [Jane] and what's going on with [Jane] vis-à-vis this case." The remainder of the court's findings were addressed to the second question: "The extent to which the size of the community would preclude anonymity of" Jane. (§ 859.1, subd. (b)(3).) The court defined the community as legal professionals practicing in the Hall of Justice, to which Mr. and Mrs. Doe, who also practiced there,

---

[12] In light of defense counsel's agreement to close the courtroom during Jane's testimony, there was no need to weigh many of the factors in section 859.1, subdivision (b), that would otherwise have to be considered in determining whether the interest in protecting the minor's reputation outweighed the defendant's interest in a public trial. (See § 859.1, subd. (b)(1), (b)(2), & (b)(4).)

In addition, subdivisions (b)(5) and (b)(7) of section 859.1 primarily reflect the original purpose of the bill that ultimately became the statute: to balance the minor victim's privacy rights with the press and public's First Amendment public trial rights. (See, e.g., Office of Criminal Justice Planning, Enrolled Bill Rpt., Analysis of Assem. Bill No. 1325 (1989-1990 Reg. Sess.) Sept. 6, 1990.) Here, there was no indication whatsoever—from appellant or any other source—that there was any First Amendment issue related to an overriding public interest in having an open hearing (§ 859.1, subd. (b)(5)), or that Jane or parents had disclosed information regarding the case to the public. (See § 859.1, subd. (b)(7).)

were well known.  As the court explained:  "[K]nowing the culture of the Hall of Justice, any lawyer who might come in and peek in and see a defense lawyer or prosecutor sitting on the stand is going to be compelled to come in through those doors to hear what they have to say.  And so while we may not intend to attract that kind of attention, it may.  And before you know it, we may have quite a sizable crowd in here.  And I just think that would completely undermine any efforts we make in closing the courtroom as to [Jane] personally."

The court's findings demonstrate that it considered the factors set forth in section 859.1 that were relevant to whether closure of the courtroom during Mr. and Mrs. Does' testimony was necessary to fully protect Jane's reputation.  (Compare *Baldwin*, *supra*, 142 Cal.App.4th at p. 1423  [in which appellate court found that section 859.1 was inapplicable because "[t]he prosecutor did not contend [the minor victim's] reputation needed protection, and the court made none of the findings required by section 859.1"].)

**b.  *The Trial Court's Ruling Under Section 859.1 Was Substantively Correct***

Appellant argues that, in addition to procedural deficiencies, the trial court's decision to close the courtroom during Mr. and Mrs. Does' testimony was substantively erroneous.  According to appellant, the court's sole rationale for closing the courtroom during their testimony was that an open courtroom would threaten Jane's anonymity and reputation, and that rationale was "destroyed" by the numerous times—from the preliminary hearing through the prosecutor's opening statement—that Mr. and Mrs. Doe were referred to by name.  Thus, appellant avers, by the time of their testimony, "the cat was already out of the bag" since "[t]hose people sitting in the audience had already heard the prosecutor describe the nature of the allegations and identify the entire family in her opening statement.  There was thus no more anonymity to protect—and thus no justification for closing the courtroom during the testimony of Jane Doe's parents."

Appellant misconstrues the nature of the prosecutor's request and the trial court's ruling.  The concern was not about spectators who might be in the courtroom during opening statements hearing the parents' names or about records clerks later coming upon the names in the written record.  Instead, the motion and the court's findings regarding

24

the need to protect Jane's reputation were focused on the small Hall of Justice community of legal professionals who knew Mr. and Mrs. Doe professionally, whose curiosity would likely be piqued by seeing that they were testifying in a criminal case, and who would therefore enter the courtroom and learn that their daughter had been molested. Again, as the court stated, the spectacle of the parents testifying could lead to "quite a sizable crowd in here," which "would completely undermine any efforts we make in closing the courtroom as to [Jane] personally."

Such an occurrence would plainly *not* protect Jane's privacy. Rather, it would both increase the number of people who heard the Does' testimony about the molestation and, in particular, would eliminate Jane's anonymity amongst the community of people with whom Jane's parents would have to continue to interact on a professional basis. (See § 859.1, subd. (b)(6).) Moreover, having to testify about their daughter's sexual victimization by a trusted family member in front of their curious professional peers would undoubtedly add to the already significant trauma experienced by Jane's family. (See *ibid.*) The court's ruling thus was not undercut by either the prior mention of Jane's parents' names or their subsequent appearance in the transcript, where there was no danger that members of the legal community in question would observe them on the witness stand and come into the courtroom to listen to them testifying about the details of their daughter's molestation.[13]

There was no substantive error in the trial court's ruling under section 859.1.[14]

---

[13] Similarly, that the prosecution issued press releases following appellant's conviction and sentencing does not undermine trial court's ruling, given that the press releases, which disclosed appellant's identity only, and not that of the Does, did not relate to the issue of concern regarding maintaining Jane's privacy at trial vis-à-vis the legal community at the Hall of Justice. (See <http://www.sfdistrictattorney.com/index.aspx?page=213>; <http://www.sfdistrictattorney.com/index.aspx?page=229> [as of May 7, 2015].)

[14] We do note that the term, "community," as used in section 859.1, is ambiguous. Although the Hall of Justice community described by the court may not be what we would imagine a typical community to be, it does meet one of the dictionary definitions of community, which is "a unified body of individuals" such as "a body of persons of

25

**4.** *Alleged Constitutional Violation of Appellant's Right to a Public Trial*

Appellant contends that, regardless of the propriety of the courtroom closure under section 859.1, the trial court violated his Sixth Amendment and state constitutional rights to a public trial when it closed the courtroom during the testimony of Jane Doe's parents.[15]

As previously discussed, under the Sixth Amendment, four factors must be satisfied before the trial court may close a courtroom to the public during any stage of a criminal trial:  "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."  (*Waller*, *supra*, 467 U.S. at p. 48; accord, *Woodward*, *supra*, 4 Cal.4th at p. 383.)

**a.** *An Overriding Interest that Is Likely to Be Prejudiced*

Regarding the requirement of advancing an overriding interest that is likely to be prejudiced, appellant essentially repeats two of his earlier arguments, both of which we have already addressed, in claiming that any interest Jane had in anonymity was not

---

common and especially professional interests scattered through a larger society."  (*Merriam-Webster Dictionary Online*, http://www.merriam-webster.com/dictionary/ community.)  Therefore, in the circumstances of this case, we find that the court reasonably concluded that the added presence and likely curiosity of this small legal community of which Jane's parents were members, centered as it was in the Hall of Justice where the trial was taking place, would make it difficult to protect Jane's anonymity were the courtroom to remain open during Mr. and Mrs. Does' testimony.

[15] To the extent respondent's forfeiture argument (see part I., B., 2., *ante*) includes appellant's failure to challenge the constitutionality of the statute as it was applied to him, we believe that defense counsel's objection to closure of the courtroom during the testimony of Mr. and Mrs. Doe was sufficient to preserve the issue for appeal.  First, the prosecutor had based her closure motion on both section 859.1 *and* the *Waller* factors.  Second, during argument on the motion, defense counsel referred to both "the statute and the case law," and observed that "the court needs an abundance of factors to close the courtroom."  Although he did not expressly mention the federal or state Constitution, counsel's reference to the case law and the need to consider various factors was adequate to preserve the issue, especially given the constitutional interests necessarily implicated by any courtroom closure.

compelling enough to override the " 'presumption of openness.' " (*Waller*, *supra*, 467 U.S. at p. 45, quoting *Press-Enterprise Co.*, *supra*, 464 U.S. at p. 510.)  He first asserts that no overriding interest was shown because the court did not hear any evidence or make any findings that disclosure of Jane's parents' testimony would damage her reputation.  As previously discussed (see part I., B., 3., a., *ante*), defense counsel agreed at the outset that Jane's right to privacy constituted an overriding interest justifying closure of the courtroom.  There was thus no need for additional evidence or findings on this point.

Appellant next asserts that closing the courtroom during Jane's parents' testimony would not further Jane's privacy interests with respect to the sexual abuse given that her anonymity had already been compromised earlier in the trial through the use of her parents' full names in court.  Again, as we previously explained (see part I., B., 3., b., *ante*), the closure order was narrowly aimed at legal professionals at the Hall of Justice who might observe Mr. or Mrs. Doe on the witness stand, be drawn into the courtroom, and hear them describe the details of the molestation, which would both invade Jane's privacy and cause additional distress to her family.  Hence, Jane's overriding interest in protection of her privacy remained unaffected by the prosecutor's use of her parents' names.

The Supreme Court has emphasized that a state's interest in "safeguarding the physical and psychological well-being of a minor is a compelling one."  (*Globe Newspaper Co.*, *supra*, 457 U.S. at pp. 607-608.)  We conclude that the first *Waller* requirement of advancing "an overriding interest that is likely to be prejudiced" was satisfied in this case.  (See *Waller*, *supra*, 467 U.S. at p. 48.)[16]

---

[16] We also observe that the California Constitution affords special protections to victims of crime.  Proposition 9, the "Victims' Bill of Rights Act of 2008:  Marsy's Law," amended the California Constitution to guarantee crime victims certain rights, including the right "[t]o be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."  (Cal. Const., art. I, § 28, subd. (b)(1).)  Marsy's Law further provides that "[a] victim, the retained attorney of a victim, a lawful representative of the

### b. *The Closure Should Be No Broader than Necessary to Protect the Overriding Interest*

Appellant argues that the trial court made no effort to ensure that the closure was no broader than needed to protect Jane's anonymity.

As previously discussed (see part I., B., 3., a., *ante*), using the framework of section 859.1, the trial court determined that, in order to protect Jane's privacy and reputation, it was necessary to close the courtroom during the testimony of her parents. As the court explained, Mr. and Mrs. Does' testimony about the sexual abuse would be "almost the same thing" as Jane testifying about it. In examining the breadth of the closure, it must be noted that the court did not close the courtroom to the public during the entire trial. (Compare *Waller*, *supra*, 467 U.S. at pp. 48-49 [trial court's blanket closure of entire seven-day suppression hearing without considering specific need for privacy was overbroad].) Nor did it even close the courtroom during all testimony "relating to" Jane Doe since, unlike with the testimony of Jane's parents, this other testimony would neither draw the Hall of Justice community into the courtroom nor reveal Jane's identity. (§ 859.1, subd. (a).) Social worker Gloria Samayou testified about the interview she conducted with Jane, in which Jane had described the sexual abuse. Pediatric nurse practitioner Susan Houser testified about the results of the forensic examination she performed on Jane. In addition, when Mrs. Doe briefly testified again during the defense case, primarily identifying photographs and describing the layout of the ranch in Sonoma, it appears that the courtroom remained open. Beyond Jane's testimony itself, the closure was limited to her parents' testimony during the prosecution case only. This was based on the court's reasonable finding that such a closure was necessary to protect Jane's privacy with respect to her parents' Hall of Justice peers, in light of their detailed testimony recounting Jane's disclosure of the sexual abuse, which included explicit descriptions of the nature of that abuse. (See part I., B., 3., b., *ante*; cf.

victim, or the prosecuting attorney upon request of the victim, may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request." (Cal. Const., art. I, § 28, subd. (c)(1).)

*United States v. Yazzie* (9th Cir. 2014) 743 F.3d 1278, 1289 [courtroom closure was narrowly tailored to asserted interest because courtroom was closed only during testimony of child victims].)

Moreover, even during the testimony in question, no one connected to the case was excluded; all courtroom personnel, as well as attorneys, assistants, and interns for the parties and, of course the jury, were present. Also, there is no indication that any portion of the trial, including the testimony in question, was not reported, and the transcripts are available for public review. Finally, although the prosecutor had stated in her motion to close the courtroom and at the hearing on that motion that she would not object to a support person for appellant being in the courtroom during the parents' testimony, neither appellant nor his counsel expressed his desire for the presence of a support person.

It is also important to note that section 859.1 itself implicitly requires the court to weigh the competing interests in determining whether protection of a minor victim's reputation requires a temporary closure of the courtroom during either the testimony of the minor or testimony relating to that minor. Hence, the statute itself permits a closure that is no broader than necessary to protect the minor victim's reputational interest. (See *Waller*, *supra*, 467 U.S. at p. 48.) Rather than making a blanket closure order based on the state's compelling interest in "safeguarding [Jane's] physical and psychological well-being," the court in this case considered the particular circumstances of the case, weighing various factors, including, inter alia, "the desires of the victim" and the "interests of parents," before making its temporary closure order. (*Globe Newspaper Co.*, *supra*, 457 U.S. at pp. 607-608, fn. omitted.) The court thereby balanced appellant's and Jane's competing interests to allow a form of closure no broader than necessary in the circumstances. (See *Waller*, at p. 48; accord, *Woodward*, *supra*, 4 Cal.4th at p. 383.)

**c.** ***Consideration of Reasonable Alternatives to Closing the Proceeding***

Appellant claims the trial court failed to consider any reasonable alternatives to closing the courtroom during Mr. and Mrs. Does' testimony.

First, section 859.1 itself addresses the requirement that the court consider reasonable alternatives to closing the courtroom by permitting only a temporary closure

of the courtroom during certain specified testimony by or relating to minor victim, and only when absolutely necessary to protect the minor's reputation. Here, the court considered the alternative of closing the courtroom during Jane's testimony only, but, after examining the relevant factors in section 859.1 and considering the specific circumstances, reasonably determined that closure during the parents' testimony was also necessary to protect Jane's reputation. (Compare *Waller*, *supra*, 467 U.S. at pp. 48-49 [court should have considered alternatives to closure of entire suppression hearing, such as obtaining more detailed information from the prosecution about the need for closure, and then "closing only those parts of the hearing that jeopardized the interests advanced"].)

Appellant nevertheless asserts that the court should have considered several additional alternatives to temporarily closing the courtroom during the testimony of Jane's parents. For example, according to appellant, the court should have asked the prosecutor to provide more information about its need for closure or questioned Jane, her therapist, or her parents. As already discussed (see part I., B., 3., a., *ante*), the court had sufficient information about Jane's situation and the importance of the interest at stake. Appellant also asserts that the court should have considered "beginning Jane Doe's parents' testimony, and then calling a recess to discuss how to proceed if the 'sizable crowd' the court feared materialized—or even if a single legal professional known to Jane Doe's parents happened to enter the courtroom. The judge could have allowed Jane Doe's parents to communicate with her via a signal of some sort if legal professionals they were acquainted with entered the courtroom. The judge could have taken other steps, as well, for example, ordering the court reporter and bailiff not to discuss the matter with other courthouse employees or legal professionals, which would have reduced the risk that gossip would draw legal professionals acquainted with Jane Doe's parents to the courtroom." Appellant also suggests that the court could have placed a sign on the door or stationed a bailiff outside the courtroom to exclude "all legal professionals not directly connected to the case." The requirement, however, is that the court consider "reasonable" alternatives to closing the courtroom. These suggestions by

appellant involve unwieldy methods that would have only served to distract both the jury and the witnesses from the testimony at hand and/or would have likely been ineffective in providing the protection the court deemed necessary.

We conclude the trial court considered reasonable alternatives to closing the courtroom during the testimony of Jane's parents. (See *Waller*, *supra*, 467 U.S. at p. 48.)

### d. *Court Must Make Findings Adequate to Support the Closure*

In asserting that the trial court did not make findings adequate to support the closure, appellant primarily repeats arguments about the propriety of closing the courtroom generally, which we have already addressed elsewhere in this opinion.[17] We believe the court's findings, in which it explained the basis of its ruling that closure was necessary, were adequate to support its decision. Unlike *Baldwin*, in which the trial court made only the conclusory finding that, "*when a child under the age . . . of 16 is testifying about such matters, the courtroom may be closed upon their request*" (*Baldwin*, *supra*, 142 Cal.App.4th at p. 1420), the record here reflects that the trial court "balanced the competing interests and fashioned an order narrowly tailored to infringe on the competing interests as little as possible." (*Id*. at p. 1243.)

In sum, because the trial court's ruling complied with the factors set forth in *Waller*, we conclude the closure of the courtroom during the testimony of Jane Doe's parents did not violate appellant's Sixth Amendment right to a public trial. (See *Waller*, *supra*, 467 U.S. at p. 48; *Woodward*, *supra*, 4 Cal.4th at p. 383.)

---

[17] For example, appellant argues that the court should have questioned Jane's parents about their wishes, should have questioned Jane or her therapist about whether the potential damage to her reputation would traumatize her, and "made no finding that disclosure of Jane Doe's identity would harm her reputation; rather it seemed to assume that it would." As to the last point, we again note that appellant not only failed to object to closing the courtroom during Jane's testimony, defense counsel acknowledged that Jane's privacy rights were "absolutely overriding."

## II. *Prior Uncharged Sexual Offenses*

Appellant contends the trial court abused its discretion and violated his due process rights when it admitted evidence of prior uncharged sexual offenses pursuant to Evidence Code section 1108.

### A. *Trial Court Background*

Before trial, the prosecutor moved in limine to introduce testimony at trial, pursuant to Evidence Code sections 1101, subdivision (b), and 1108, regarding prior uncharged offenses committed by appellant. Specifically, the prosecutor asked that appellant's adult daughters, Isabel and Victoria be permitted to testify about appellant's sexual abuse of them when they were young children; that appellant's ex-brother-in-law, Jaime B., be permitted to testify that appellant forcibly engaged in anal intercourse with him when he was a child; that appellant's ex-wife, Donna Asturias, be permitted to testify about his possession of a magazine containing pornographic photographs of very young looking girls, about a video he took of young girls at a water park, "zoom[ing] in on the children's vaginas and butts," and about a pornographic photograph she found in his possession, which depicted a girl who appeared to be approximately three years old; and that appellant's cousin, "Tony" B. be permitted to testify that appellant sent him pornographic images of prepubescent girls via the Internet.

Following an Evidence Code section 402 hearing, during which Isabel testified about appellant's sexual abuse of her as a child, the court told defense counsel and the prosecutor that there was "no doubt in my mind that [Isabel's proposed testimony] is definitely proper [section] 1108 testimony. And there are incredible similarities between what Isabel has testified to and what we believe that . . . Jane Doe is going to testify to." The court later reiterated its belief that the probative value of Isabel's testimony was not outweighed by the danger of undue prejudice, and found it admissible under both section 1108 and section 1101, subdivision (b). The court further stated that it was willing to consider whether to also admit Victoria's proposed testimony if the prosecutor chose to bring her from El Salvador to testify at an Evidence Code section 402 hearing. Finally, the court found that Jaime B.'s proposed testimony "is definitely in the category of far

32

more prejudicial than probative.  [¶] . . . [¶]  So my feeling is . . . that I probably would not let that in."  The prosecutor then withdrew Jaime B. as a proposed witness due to the potentially prejudicial nature of his testimony.[18]

Some time after the initial Evidence Code section 402 hearing at which Isabel testified, the court held another Evidence Code section 402 hearing at which Victoria was expected to testify.  At that hearing, defense counsel withdrew his request for an Evidence Code section "1108 hearing," based on the prosecutor's offer of proof regarding Victoria's testimony.  Counsel then asked "to make [an Evidence Code section] 352 argument" instead.  Counsel stated that "the fear[] of the defense is that this jury will be making a decision ruling on guilt based upon an inordinate amount of 1101/1108 evidence.  To date, the court has ruled admissible information from Donna, [Tony], Isabel, and now, with the expected admission of Victoria, what I would ask the court at this point is to revisit the issue of the admissibility of Donna and [Tony].  [¶]  Taking the offer of proof contained in the People's 1108 argument for Victoria, that clearly, as well as with Isabel, appear to be [*sic*] the most relevant and probative for these charges. . . .

"So what I'm asking the court at this time to do, in light of the information provided by Isabel and Victoria, that the court revisit the information from Donna and [Tony], rule that that is more prejudicial than probative, and proceed forward only allowing the testimony relating to Isabel and Victoria."

Following additional argument by the prosecutor, defense counsel responded: "I'm not, with this argument, trying to curtail Victoria or Isabel. . . .  [¶]  And I think that by allowing in the information from Victoria and Isabel, which does appear relevant to the allegation with regards to [Jane] Doe, without the information from [Tony] and Donna, I think what it does is sanitize potential prejudice with issues that aren't directly related to this case . . . .  [¶] . . . [¶]  What I'm asking for is the court to sanitize the 1101 and 1108 and allowing in the most probative so we are not trying uncharged cases."

---

[18] The court had previously found admissible, with certain limitations, the proposed testimony of Donna and Tony.

33

The court ruled, based on the prosecutor's offer of proof, that Victoria could testify, but that it would "only . . . allow her to testify to any acts that are the same as those alleged with [Jane], namely of the fondling of her vagina, vulva, crotch, breasts." The court also said it would allow "her testimony that the defendant took photos of her and would have her pose in different positions, because I do think that's somewhat relevant to the whole issue of child pornography and his intent as to what he's viewing, . . . but I am not going to allow the testimony with regard to the oral copulation or the use of the massager. I think that kind of tips . . . towards the prejudice and a little bit away from the probative value . . . ."[19]

The court then revisited its ruling on the admissibility of Donna's and Tony's testimony, and determined that Tony's testimony was highly relevant and admissible, but that Donna's testimony could be unduly prejudicial and should therefore be excluded.

At trial, Isabel and Victoria testified to the sexual abuse appellant inflicted on them when they were young children. The court thereafter instructed the jury based on CALCRIM No. 1191, regarding evidence of uncharged sex offenses.[20]

---

[19] Thereafter, defense counsel also stated that he had no objection to Victoria testifying that appellant showed her a book of adults and children engaging in sexual acts, in an attempt to convince her that the sexual abuse was normal so that she would continue to tolerate it.

[20] The court's instruction, pursuant to CALCRIM No. 1191, provided as follows: "The People presented evidence that the defendant committed the crimes of Lewd and Lascivious Act upon [a] Child under the age of 14 and/or Continuous Sexual Abuse against Victoria and Isabel that were not charged in this case. These crimes are defined for you in these instructions.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or

34

## B.  *Legal Analysis*

As a preliminary matter, we note that the record is unclear regarding whether appellant objected to admission of the testimony of either Isabel or Victoria.  Although the discussion between counsel and the court at the two relevant hearings on this issue were somewhat convoluted, defense counsel did state that the sisters' testimony would be both relevant and probative, and asked that only their testimony be admitted at trial, arguing that the testimony of Tony and Donna. should be excluded under Evidence Code section 352 as more prejudicial than probative.  What is not clear is whether counsel was making this argument as a suggested compromise, given the court's apparent decision to admit Isabel's and Victoria's testimony in any case, or whether he had withdrawn his initial objection to the sisters' testimony.[21]  Giving appellant the benefit of the doubt, we will presume that appellant preserved this issue for appeal.

Evidence Code section 1108, subdivision (a), provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101,[22] if the evidence is not inadmissible pursuant to Section 352."[23]

---

inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit Continuous Sexual Abuse and/or Lewd and Lascivious Act upon a Child, as charged here.  If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the charged crimes of Continuous Sexual Abuse and/or Lewd and Lascivious Act upon a Child.  The People must still prove each charge beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

[21] Counsel did raise this issue in a motion for a new trial, which the court denied. The filing of a new trial motion, however, was not alone sufficient to preserve the issue for appeal.  (See *People v. Mayorga* (1985) 171 Cal.App.3d 929, 940-941.)

[22] Subdivision (a) of Evidence Code section 1101 provides:  "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

35

"In enacting section 1108, the Legislature recognized the ' "serious and secretive nature of sex crimes and the often resulting credibility contest at trial," ' and intended in sex offense cases to relax the evidentiary restraints imposed by section 1101 'to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility.' [Citation.]" (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 965 (*Hernandez*).) In *People v. Johnson* (2010) 185 Cal.App.4th 520, 532, footnote 9, a panel of this Division discussed the particularly probative nature of prior sexual offense evidence in sex offense prosecutions: "The legislative history of section 1108 suggests an underlying psychological abnormality that makes such evidence especially probative: 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 882 (1995-1996 Reg. Sess.) as amended July 18, 1995, p. 8.)"

In *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), our Supreme Court held that Evidence Code section 1108 does not violate a defendant's due process rights. While acknowledging the general rule against admitting propensity evidence due to its great potential to unduly prejudice the defendant (see § 1101, subd. (a)), the court held that, "in light of the substantial protections afforded to defendants in all cases to which section 1108 applies, we see no undue unfairness in its limited exception to the historical rule against propensity evidence." (*Falsetta*, at p. 915.)

The "substantial protections" to which the *Falsetta* court referred consist of the requirement that the court "engage in a careful weighing process under section 352." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) As part of this weighing process, "the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature

---

[23] In his briefing, appellant's entire argument focuses on the propriety of admitting this testimony under Evidence Code sections 1108 and 352. Hence, we do not address the alternative basis for the court's ruling: Evidence Code section 1101, subdivision (b).

36

of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 (*Branch*), citing *People v. Harris* (1998) 60 Cal.App.4th 727, 737-741 (*Harris*).) " ' " 'As with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission*.' " ' " (*People v. Loy* (2011) 52 Cal.4th 46, 62, quoting legislative history; accord, *People v. Merriman* (2014) 60 Cal.4th 1, 62.) In addition, section 1108 does not require any particular similarity between the charged offense and a defendant's other offenses since such a requirement " ' "would tend to reintroduce the excessive requirements of specific similarity under prior law which [section 1108] is designed to overcome . . . . Many sex offenders are not 'specialists,' and commit a variety of offenses which differ in specific character." ' [Citation.]" (*People v. Soto* (1998) 64 Cal.App.4th 966, 984, quoting legislative history.)

We review the trial court's decision to admit the prior offense evidence for an abuse of discretion. (*Hernandez*, *supra*, 200 Cal.App.4th at p. 966.)

With respect to the probative value of the testimony in question, defense counsel himself acknowledged that the prior sexual offense evidence was extremely probative regarding whether appellant committed the current offenses against Jane Doe. (See *Branch*, *supra*, 91 Cal.App.4th at p. 282.) We disagree with appellant's assertion that the probative value of the evidence was significantly diminished by the fact that neither Isabel nor Victoria came forward to accuse appellant until after they heard that he had been accused of molesting Jane. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [probative value of evidence of "same design or plan" may be further increased if independent evidence of additional instances of similar misconduct were produced].) Isabel had never met the Doe family, while Victoria had met Mr. Doe only once, in the 1990's. That they each came forward only after hearing from their half brother about the current allegations against appellant does not diminish the probative value of their testimony in the circumstances of this case.

Appellant further claims that the danger of undue prejudice outweighed the inarguably probative value of the prior offense evidence, as shown by an examination of the four factors relevant to such a determination. (See *Branch*, *supra*, 91 Cal.App.4th at p. 282.) We disagree.

First, appellant claims that the prior offense evidence was more inflammatory than the evidence regarding appellant's sexual abuse of Jane Doe. In particular, he points out that Isabel testified that she woke up naked in bed with her siblings after being given a pill by appellant; that appellant moved her back and forth on his lap while he had an erection; that he placed his erect penis near her vagina while they were both naked, and may have attempted to penetrate her; that, while in the shower together, he washed her vagina and asked her to wash him, while he had an erection; and that he locked her in a closet with her brother and a video camera and asked her brother to "fuck" her. Appellant also observes that, although the court excluded some of Victoria's proffered testimony, it allowed her to testify that appellant forced her to pose naked while he took photographs of her.[24]

Although some of the evidence regarding appellant's molestation of Isabel may have been more inflammatory than the evidence regarding his abuse of Jane, we do not believe that testimony was so highly prejudicial as to outweigh the probative value of this evidence. Most of the prior offense evidence was strikingly similar to that of Jane (see discussion, *post*) and, moreover, it is to be expected that appellant, who had significantly greater access to and privacy with his daughters, would engage in some conduct with them that circumstances would not allow him to engage in with Jane. (See *Branch*, *supra*, 91 Cal.App.4th at pp. 283-284 ["While appellant seems to have engaged in a wider variety of sexual offenses over a longer period of time with [prior victim], the

---

[24] The court excluded potentially inflammatory testimony by Victoria "with regard to the oral copulation or the use of the massager." The court apparently admitted the testimony regarding appellant taking photographs of Victoria under Evidence Code section 1101, subdivision (b), based on its relevance "to the whole issue of child pornography and his intent as to what he's viewing."

nature of the offenses was very similar to the ones involving [current victim]," which made it "unlikely that the jury would have been so prejudiced against appellant as a consequence of [prior victim's] 'inflammatory' testimony that he was denied a fair trial"]; compare *Harris*, *supra*, 60 Cal.App.4th at p. 738 [where defendant was charged with nonviolent sex offenses against women he knew, prior offense evidence involving a wholly dissimilar vicious attack on a stranger 23 years earlier was "inflammatory in the extreme"].)

Second, according to appellant, the jury likely convicted him of sexually abusing Jane to punish him for committing the uncharged prior offenses against his daughters. Both Isabel and Victoria stated that they were testifying because they believed that appellant had to be stopped. Even assuming this testimony alerted the jury to the fact that appellant had not been convicted of the prior offenses, there is no evidence to support appellant's hypothesis that the jury's verdict in this case was based on a desire to punish appellant for molesting his daughters. Nor is there any indication that the issues were confused. Indeed, of the many questions the jury asked during deliberations, none related to the prior offense evidence. (See *Branch*, *supra*, 91 Cal.App.4th at p. 284.) Moreover, the court gave CALCRIM No. 1191, which instructed the jury to consider the prior offense evidence "only for the purpose of showing that appellant 'was disposed or inclined to commit sexual offenses' and . . . admonished [it] not to 'consider this evidence for any other purpose.' " (*Hernandez*, *supra*, 200 Cal.App.4th at p. 969.) We presume the jurors understood and followed this instruction. (*Ibid*.)

Third, appellant argues that the remoteness of the prior offenses—which occurred, at the latest, 28 years before the offenses against Jane—diluted their probative value and rendered them unduly prejudicial. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. [Citation.]" (*Branch*, *supra*, 91 Cal.App.4th at p. 284.) However, "significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' [Citation.] Put differently, if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged

39

offenses. (*Id.* at p. 285 [30-year gap between past and present offenses was not too remote, given remarkable similarities between charged and uncharged offenses]; see also, e.g., *Hernandez*, *supra*, 200 Cal.App.4th at pp. 967-968 [gap of up to 40 years between similar offenses]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [gap of up to 20 years between similar offenses]; *Soto*, *supra*, 64 Cal.App.4th at pp. 977-978, 991-992 [gap of up to 30 years between similar offenses]; compare *Harris*, *supra*, 60 Cal.App.4th at pp. 738-739 [prior crime, which occurred 23 years earlier, was inflammatory "*in the extreme*," far more serious, and wholly dissimilar to charged offenses].)

Here too, there were significant similarities between the charged and uncharged offenses. All of the offenses involved young, prepubescent, female relatives whom appellant repeatedly molested over multiple years by touching them in the vaginal area. He engaged in these acts primarily at his or other family members' homes, in private, but often with other people nearby. Although, as discussed earlier, appellant engaged in some additional acts with Isabel and Victoria, the charged and uncharged offenses are nonetheless "remarkably similar." (*Branch*, *supra*, 91 Cal.App.4th at p. 285.) Accordingly, the substantial similarities between the charged and uncharged offenses balanced out the remoteness of the prior offenses. (See *ibid*.)

Fourth, appellant asserts that he was prejudiced by the fact that Isabel's and Victoria's testimony, which covered 65 pages of reporter's transcript, consumed more time—i.e., two additional pages of reporter's transcript—than did Jane's testimony. This was not an undue consumption of time, especially given that presentation of all of the testimony at trial consumed approximately 580 pages, which means the prior offenses testimony took up less than 12 percent of the total testimony. (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [defendant was not prejudiced by amount of time it took to present evidence of uncharged crimes where evidence related to those crimes consumed 27 percent of total trial transcript].)

In sum, we conclude the trial court did not abuse its discretion when it determined that the danger of undue prejudice did not outweigh the probative value of the prior sexual offense evidence in demonstrating appellant's disposition to commit the charged

offenses.  (See Evid. Code, §§ 1108, 352; *Falsetta*, *supra*, 21 Cal.4th at pp. 917-918; *Branch*, *supra*, 91 Cal.App.4th at p. 282.)[25]

### III.  *Restitution for Noneconomic and Economic Damages*

Appellant contends the award of $625,000 in noneconomic restitution was not authorized by law, violated his due process rights, and constituted an abuse of discretion. Appellant further claims that the restitution award for both economic and noneconomic damages violated his right to a jury trial.

### A.  *Trial Court Background*

Before sentencing, the prosecutor sought victim restitution in the amount $625,000 for noneconomic damages and $5,875 for economic damages.  At the sentencing hearing, defense counsel addressed the requested restitution amounts, stating, "[i]n terms of the defense, we are not seeking a hearing on those issues.  We are conceding the economic. They seem absolutely appropriate under the statute.

"In terms of the noneconomic, it appears to be based upon the case of *People v. Smith* [(2011) 198 Cal.App.4th 415 (*Smith*)], which the [district attorney's] office has cited. . . .  That was a case last year. . . .  [¶]  My question and my objections first, that it's improper under due process protections, so I protect those arguments.  But most importantly, Your Honor, there doesn't appear to be, even in the *Smith* case, substantiation for the amount.  The [District Attorney's] office is asking for not only the period of time that the facts were based in trial and the allegations [*sic*], but two years— roughly two years of litigation and an additional eight years thereafter.

"The *Smith* case, what the amount was based on, purely the period of abuse.  So again, I would submit on the period of abuse under the *Smith* case.  But to suggest that $50,000 per year while the case was being litigated appears to set up a situation where to take the time to litigate a case or perhaps get assignment out to a courtroom would potentially cost the defendant $50,000.  So I don't think there's a basis in the *Smith* case.

---

[25] In light of this conclusion, we also reject appellant's claim that the court's abuse of discretion violated his due process rights.

"I'll submit with my objections on noneconomic damages, but that they be based upon the period of abuse that was found at the trial and not for subsequent litigation or an additional eight years. I'm not sure of the basis for that, so I would object."

The prosecutor responded that, just as in the case of *Smith*, *supra*, 198 Cal.App.4th 415, the prosecution was requesting $50,000 per year in noneconomic restitution from the start of the abuse through trial, with an additional eight years of future restitution thereafter. The prosecutor further argued, "And I think we've show[n] evidence of trauma by the fact that the victim had already engaged in over two years of therapy. The fact that at the beginning of the therapy process there were declarations from [Jane's mother and therapist] stating the . . . emotional trauma that she had suffered, to the point that early in her therapy they didn't think she would be able to emotionally testify in this case, along [with] the fact that she continued to undergo therapy and has and still continues to have a fear of harm from the defendant that somehow he will get up and escape jail and he will hurt her for telling the truth and for stopping the abuse."

The court then ruled on the restitution request as follows: "I order restitution in the amount of $5,875 for economic losses due to the cost of providing ongoing therapy to date for [Jane] and Mrs. [Doe].

"Also, pursuant to the request for additional restitution under the *Smith* formula, I do find that it is appropriate in this case, not only for the time that you abused [Jane] for those two years, but for the two years of this pending litigation while this child had to wait and, frankly, worry about whether you were going to get out of jail and whether or not she was going to have to testify and the fact that she had to testify, and also for the psychological trauma she will no doubt continue to suffer for many years ahead.

"For all that, under the *Smith* formula, I am going to award $50,000 a year for a period of 12.5 years, again, 2.5 years of having suffered the abuse at your hands, the two years during the duration of this litigation, and an additional eight years in the future until she is . . . 16 years of age."

## B. *Legal Analysis*

Article I, section 28, subdivision (b)(13)(A)-(C), of the California Constitution, provides crime victims the right to restitution from criminal defendants. Section 1202.4, subdivision (f), which implements that constitutional right, "requires the trial court to order the defendant to pay restitution to the victim 'in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.' 'The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution . . . .' (§ 1023.4, subd. (f)(1).)" (*Smith*, *supra*, 198 Cal.App.4th at p. 431.)

Although restitution orders are generally limited to the victim's economic damages, under section 1202.4, subdivision (f)(3)(F), restitution shall be ordered for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." Unlike economic damages, which are concerned with "objectively verifiable monetary losses" (Civ. Code, § 1431.2, subd. (b)(1)), noneconomic damages relate to "subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2); see *Smith*, *supra*, 198 Cal.App.4th at p. 431.)

### 1. *The Restitution Award for Noneconomic Damages Was Not an Unauthorized Sentence*

Appellant first argues that the restitution award for noneconomic damages was not authorized by law because he was convicted of continuous sexual abuse of a child under the age of 14 pursuant to section 288.5, while section 1202.4, subdivision (f)(3)(F), expressly provides for the award of noneconomic restitution "for felony violations of Section 288" only. He further argues that, because section 288 is not a lesser included offense of section 288.5, "his section 288.5 conviction cannot be viewed as the equivalent

43

of three section 288 convictions."[26]

"Section 288.5 was enacted in 1989 in order to remedy some of the problems of pleading, proof and jury instruction that had arisen in the prosecution of 'resident child molesters' under section 288. [Citations.] It provides a severe penalty (6, 12 or 16 years in prison) for anyone who, while residing with or having recurring access to a child under the age of 14, engages, over [three] months or longer, in [three] or more acts of substantial sexual conduct, as defined in section 1203.066, subdivision (b), or lewd acts under section 288. (§ 288.5, subd. (a).) Only one count of section 288.5 may be charged for each victim, and no other felony sex offense may be charged involving the same victim and occurring within the charged time period. (§ 288.5, subd. (c).)" (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1308 (*Avina*).)

Appellant is correct when he observes that some violations of section 288.5 might not also constitute violations of section 288, given that section 288 requires a specific "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child," while section 288.5 can be violated without possession of such an intent.[27] (See *Avina*, *supra*, 14 Cal.App.4th at p. 1313.) As Division Three of this

---

[26] At oral argument, we granted the request of appellant's counsel to provide supplemental briefing on this issue. Both appellant and respondent submitted letter briefs, which we have considered.

[27] Section 288.5 provides in relevant part: "(a) Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ."

Section 1203.066, subdivision (b), defines the "substantial sexual conduct" discussed in section 288.5 as "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender."

Section 288, subdivision (a), provides in relevant part: "[A]ny person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or

44

District explained in *Avina*, *supra*, 14 Cal.App.4th at pages 1313-1314: "Section 288 requires the specific intent of 'arousing, appealing to, or gratifying the lust or passions or sexual desires of [the defendant] or of the child . . . .' A conviction for section 288.5, in contrast, could be based upon a course of substantial sexual conduct within the meaning of section 1203.066, subdivision (b), which requires no specific intent. . . . [S]uch acts could be engaged in for nonsexual purposes, for example for the infliction of pain, or to appeal to the sexual interest of a third person. Because section 288.5 could be violated without necessarily also violating section 288, the latter is not necessarily included within the former."

In this case, respondent contends the jury must necessarily have found that appellant acted with the specific intent described in section 288 when it convicted him of violating section 288.5 because the trial court instructed the jury, pursuant to CALCRIM No. 252, that continuous sexual abuse, as charged in count 1, and lewd and lascivious act on a child, as charged in counts 2 and 3, "require a specific intent or mental state . . . . For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime." The court then instructed the jury regarding the elements of those crimes. (CALCRIM Nos. 1110 & 1120.)

The instruction on continuous sexual abuse, however, did not completely resolve this issue. That instruction told the jury that, to find appellant guilty of continuous sexual abuse, the People were required to prove, inter alia, that appellant "engaged in three or

---

any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony . . . ."

Under subdivision (c) of section 288.5, "[n]o other act of substantial sexual conduct, as defined in subdivision (b) of Section 1203.066, with a child under 14 years of age at the time of the commission of the offenses, or lewd and lascivious acts, as defined in Section 288, involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative."

45

more acts of substantial sexual conduct or lewd or lascivious conduct with the child."
(CALCRIM No. 1120.) Although the instruction described the specific intent necessary
for lewd or lascivious conduct, it merely defined "substantial sexual conduct" as
"masturbation of either the child or the perpetrator, or penetration of the child's or
perpetrator's vagina or rectum by the other person's penis or any foreign object," without
discussing the intent requirement. (*Ibid.*)

Finally, the court instructed the jury, pursuant to CALCRIM No. 3516, that count
1 (continuous sexual abuse) and counts 2 and 3 (lewd and lascivious acts on a child) were
alternative charges and that, if the jury found appellant guilty of count 1, it was required
to find him not guilty of counts 2 and 3.

Although we agree with appellant that CALCRIM No. 1120 left unclear the intent
required for a finding that appellant had engaged in substantial sexual conduct, we
nevertheless are convinced that, in the totality of the circumstances, it is inconceivable
that the jury could have found that appellant engaged in the acts described as substantial
sexual conduct without also finding that he possessed the specific "intent of arousing,
appealing to, or gratifying the lust, passions, or sexual desires of" himself or Jane Doe.
(§ 288, subd. (a).) That is because none of the evidence presented or arguments of
counsel during trial even hinted at the possibility that appellant had anything other than
the sexual intent described in section 288 when he touched Jane.[28] Moreover, although
the jury instructions on intent were incomplete, the only intent discussed in those
instructions was specific sexual intent. Indeed, when instructing on the alternative nature
of count 1 (continuous sexual abuse) and counts 2 and 3 (lewd and lascivious act on a

---

[28] For example, during closing argument, the prosecutor stated that the jury could
consider the testimony of appellant's daughters and his cousin Tony "to show that
[appellant] acted with a sexual intent when he sexually abused [Jane], when he touched
her in the vagina . . . ." Again, during her rebuttal argument, the prosecutor asked the
jury: "[I]s that [the touching of Jane's vagina] an innocuous act? Is that an act that does
not have anything to do with sexual intent or sexual gratification? I submit to you that
that is evidence that the defendant's intent and the way he acted was sexual interest in
arousing and to [*sic*] appealing to either trying to arouse [Jane's] interest which, as we
hear from the testimony, did not work, or to satisfy his own sexual interest in this case."

46

child), after telling the jury that, if it found appellant guilty of continuous sexual abuse in count 1, it was required to "find him not guilty of the two counts of lewd and lascivious act upon a child. *It [count 1], essentially, encompasses what's charged in counts 2 and 3.*" (Italics added.)

Hence, given the complete lack of evidence that appellant's repeated acts of sexual abuse were "engaged in for nonsexual purposes, for example for the infliction of pain, or to appeal to the sexual interest of a third person" (*Avina*, *supra*, 14 Cal.App.4th at pp. 1313-1314), we conclude that the jury necessarily found that appellant possessed the specific sexual intent described in section 288 when it found him guilty of continuous sexual abuse under section 288.5.

Appellant asserts that, even assuming that the jury's finding of guilt under section 288.5 constituted a finding that he had committed three or more violations of section 288, the noneconomic restitution award was nonetheless improper because, even though section 1202.4, subdivision (f)(3)(F), refers to "violations" rather than *convictions* of section 288, an award of noneconomic restitution in this case based on unadjudicated violations of section 288 would violate, inter alia, his constitutional rights to due process and a jury trial. We disagree.

As already discussed, the jury in this case found appellant guilty of section 288.5 based on three or more violations of section 288. Thus, because the section 288.5 conviction necessarily encompassed violations of section 288, to hold that Jane could have recovered noneconomic restitution had appellant been convicted of a single violation of section 288, but may not recover such restitution after the jury found that he had committed multiple violations of the same statute, would lead to an absurd result. (See *People v. Adames* (1997) 54 Cal.App.4th 198, 212 (*Adames*) [" '[w]e will not parse each literal phrase of a statute if doing so contravenes the obvious underlying intent, or leads to absurd or anomalous results' "]; see also *Avina*, *supra*, 14 Cal.App.4th at p. 311 ["section 288.5 focuses on 'a series of acts occurring over a substantial period of time, generally on the same victim and generally resulting in cumulative injury' "]).

47

In *Adames*, *supra*, 54 Cal.App.4th 198, the appellate court addressed a similar issue with respect to section 1202.1, a statute mandating AIDS testing for defendants convicted of crimes listed in subdivision (e) of the statute. The defendant in that case was charged with and convicted of continuous sexual abuse of a child under section 288.5, which was not listed in section 1202.1, subdivision (e), although section 288 was a listed offense. (*Adames*, at p. 213.) The court considered whether AIDS testing could be ordered only when a defendant was convicted of a listed offense or whether, instead, testing could be ordered if the conduct of which the defendant was convicted encompassed a listed offense. (*Ibid.*)

The *Adames* court concluded: "The Legislature's intent clearly is to require AIDS testing of anyone who has committed '[l]ewd or lascivious acts with a child in violation of Section 288[.]' [(§ 1202.1, subd. (e)(6).)] The interpretation that restricts AIDS testing only to convictions under section 288 leads to a patently absurd result. Logically, the Legislature did not intend to require AIDS testing where a defendant violated section 288 under some circumstances, e.g., where he was charged with a violation of and convicted under section 288, but not under other circumstances, e.g., where he was convicted of section 288.5 based on multiple violations of section 288. We therefore adopt the . . . interpretation requiring the AIDS testing mandate of section 1202.1 to apply to a conviction which necessarily encompasses a violation of section 288. [Citation.]" (*Adames*, *supra*, 54 Cal.App.4th at p. 213.)

Here too, we decline to adopt an interpretation of section 1202.4, subdivision (f)(3)(F), that would lead to a "patently absurd result" (*Adames*, *supra*, 54 Cal.App.4th at p. 213), and conclude that the trial court properly awarded Jane noneconomic restitution based on appellant's conviction for violating section 288.5, which, as we have found, "necessarily encompasses" multiple violations of section 288. (*Adames*, at p. 213)

### 2. *The Restitution Award Did Not Violate Appellant's Sixth Amendment Right to a Jury Trial*

Appellant contends the trial court's restitution award amounted to punishment and therefore violated his Sixth Amendment right to a jury trial, pursuant to *Southern Union*

*Co. v. United States* (2012) 132 S.Ct. 2344 (*Southern Union Co.*) and *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).[29]

In *Apprendi*, *supra*, 530 U.S. at page 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Blakeley v. Washington* (2004) 542 U.S. 296, 303, the court further explained that the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." A trial court, therefore, may not impose punishment that the jury's verdict alone does not allow. (*Id*. at pp. 303-304.)

More recently, in *Southern Union Co.*, *supra*, 132 S.Ct. at page 2357, the United States Supreme Court held that *Apprendi* applies to the imposition of criminal fines. In that case, the defendant company had been convicted of an environmental offense, which called for a maximum fine of $50,000 for each day the relevant statute was violated. (*Southern Union Co*., at p. 2349.) The jury had not made a specific finding as to the number of days of violation, and the trial court therefore made that finding. (*Ibid*.) The high court reversed, after holding that the trial court's factual finding as to the number of days the defendant committed the offense violated *Apprendi*. (*Southern Union Co*., at p. 2357.) As the court explained: "*Apprendi's* 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.' [Citation.] That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union Co*., at p. 2351.)

California courts, however, have uniformly concluded that victim restitution is not primarily criminal in nature. (See, e.g., *People v. Pangan* (2013) 213 Cal.App.4th 574, 585 ["direct victim restitution is a substitute for a civil remedy so that victims of crime do

---

[29] Although appellant did not object in the trial court on this ground, his contention that he was denied his right to a jury trial is exempt from the forfeiture rule. (See *People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9.)

not need to file separate civil suits"]; *People v. Millard* (2009) 175 Cal.App.4th 7, 35-36 [primary purpose of a victim restitution hearing is "to provide a victim with a civil remedy for economic losses suffered, and not to punish the defendant for his or her crime"]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 648-649 ["Although restitution has an element of deterrence [citation], the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime"].) As the cases point out, the chief purpose of a victim restitution order is to compensate the victim for losses, not to punish the defendant for the offense committed. (Compare *Southern Union Co.*, *supra*, 132 S.Ct. at p. 2350 [criminal fines are penalties imposed by the state based on commission of offenses].)

In addition, victim restitution is distinguishable from a criminal fine in that a fine has a statutory maximum as to the amount of money that may be ordered paid. With victim restitution, the purpose of which is full reimbursement for all losses incurred, there is no specified limit on the amount that may be awarded. (*People v. Harvest*, *supra*, 84 Cal.App.4th at p. 647.) Thus, victim restitution orders—whether for economic or noneconomic losses—are simply not comparable to criminal fines. Accordingly, just as there can be no *Apprendi* violation where the trial court imposes a restitution fine within the range prescribed by statute (see *Southern Union Co.*, *supra*, 132 S.Ct. at p. 2353; *People v. Kramis* (2012) 209 Cal.App.4th 346, 351), there can be no such violation where the court orders victim restitution, for which "no maximum is prescribed." (*Southern Union Co.*, at p. 2353 [observing that there can "be [no] *Apprendi* violation where no [statutory] maximum is prescribed"]; cf. *United States v. Phillips* (9th Cir. 2012) 704 F.3d 754, 770-771 [distinguishing *Southern Union Co.*, by observing, in context of criminal forfeiture, that "[a] judge cannot exceed his constitutional authority by imposing a punishment beyond the statutory maximum if there is no statutory maximum"].)

For these reasons, appellant was not entitled to a jury trial on the amount of victim restitution to be ordered pursuant to section 1202.4.

### 3. *The Restitution Award Did Not Violate Appellant's Due Process Rights*

Appellant next argues that the trial court erred and violated his due process rights by awarding noneconomic restitution to Jane for the time between appellant's arrest and trial. (See *In re Lewallen* (1979) 23 Cal.3d 274, 278-279 [trial court violates due process when it treats a defendant more harshly because he or she exercises jury trial right].)

The trial court stated that, "under the *Smith* formula, I am going to award $50,000 a year for a period of 12.5 years, again, 2.5 years of having suffered the abuse at your hands, the two years during the duration of this litigation, and an additional eight years in the future until she is . . . 16 years of age." Appellant objected to the restitution award for the period between appellant's arrest and his conviction.

First, we do not agree that the trial court was punishing appellant for exercising his right to a jury trial. The court was aware of Jane's fear of appellant and fear of testifying, from the time she reported the abuse onward. The court also found that Jane would continue to feel the effects of the abuse for many years after it occurred, not just until appellant was convicted. The period of litigation was thus merely one phase in the years of suffering the court found that Jane had experienced in the past and would continue to experience in the future as a result of the abuse. Second, as the appellate court in *Smith* explained: "We are not concerned with the court's statements in making the award. As would a jury, the court was searching for some way to quantify [the victim's] pain and suffering." (*Smith*, *supra*, 198 Cal.App.4th at p. 437.)[30] Here, the trial court did not err in awarding noneconomic restitution to Jane for the ongoing trauma she suffered as a result of appellant's conduct, both before and after his conviction.

---

[30] In *Smith*, the trial court had stated that it was awarding the victim $50,000 per year in noneconomic restitution for 15 years of sexual abuse, which ended when she was 23. The defendant argued that this award was improper, since the defendant was convicted of only seven years of abuse, until the victim turned 15. The appellate court found no abuse of discretion, stating that there was no credible argument that the victim's "psychological harm ended when she was 15 years old." (*Smith*, *supra*, 198 Cal.App.4th at p. 437.)

#### 4. *The Trial Court Did Not Abuse Its Discretion*

Appellant's final restitution-related contention is that the trial court's award of $625,000 in noneconomic damages constituted an abuse of discretion.

The trial court awarded Jane $50,000 per year in restitution for a total of 12.5 years, which included the two and one-half years of abuse, the two years between her report of the abuse and appellant's conviction, and an additional eight years, until she turned 16, to compensate her "for the psychological trauma she will no doubt continue to suffer for many years ahead." Appellant objected, and argued that the noneconomic restitution should be limited to the years during which Jane was abused.

"Generally speaking, restitution awards are vested in the trial court's discretion and will be disturbed on appeal only when the appellant has shown an abuse of discretion. [Citation.] . . . ' "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." ' [Citation.] ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citation.]" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)

In *Smith*, *supra*, 198 Cal.App.4th at page 436, the appellate court found that this standard was not applicable to victim restitution for noneconomic losses since, "[u]nlike restitution for economic loss, . . . [restitution] for noneconomic loss is subjectively quantified." The *Smith* court adopted a standard of review based on the civil jury instruction regarding noneconomic loss. (*Smith*, at p. 436, quoting CACI No. 3905A (2009 ed.) [" 'No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense' "].) As the *Smith* court explained: "The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance. Even with that difference in mind, we see no reason to adopt any other

standard of review.  We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court.  [¶]  Admittedly, this standard is not as delimited as the review of a restitution order for economic damages.  By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the . . . victim's economic loss.' [Citation.]  Noneconomic damages, however, require more subjective considerations. Thus, the different standard is justified."  (*Smith*, at p. 436.)

Applying this different standard, the *Smith* court held that the trial court did not abuse its discretion when it ordered the defendant to pay $750,000 in restitution for noneconomic losses to the victim who had suffered years of sexual abuse.  (*Smith*, *supra*, 198 Cal.App.4th at p. 436.)  We agree with the court in *Smith* that the standard of review for restitution orders for economic losses is not directly applicable to review of an order for noneconomic losses, which requires a more subjective analysis.

In this case, the molestation of Jane Doe began when she was four years old, and continued for two and one-half years, until she reported the abuse to her parents at age six.  Her abuser was her "Uncle Al," a close and beloved family member, who had repeated access to Jane over some of the most vulnerable years of her short life because of the family's complete trust in him.  There is evidence in the record of Jane's psychological trauma during the years of and immediately after the abuse.  There is of course no evidence in the record of what the future will hold for Jane.  It would, however, be naïve to assume that there will be no continuing psychological and emotional repercussions after suffering such lengthy abuse, at such a tender age, by a much-loved relative.  In light of the evidence in the record of appellant's betrayal and its inevitably traumatic effects on Jane, we conclude the restitution order in this case, which includes the upcoming years only until Jane turns 16, does not "shock the conscience or suggest passion, prejudice or corruption on the part of the trial court."  (*Smith*, *supra*, 198 Cal.App.4th at p. 436.)  There was no abuse of discretion.

**DISPOSITION**

The judgment is affirmed.

_____

Kline, P.J.


We concur:


_____

Stewart, J.


_____

Miller, J.